BILL ALEXANDER v. THE STATE.

No. 1637.   Decided January 11, 1899.

Motion for Rehearing Decided April 19, 1899.

**1.   Murder—Evidence.**

On a trial for murder, where the State had proved that the difficulty grew out of statements made by the wife of defendant that she had seen deceased kiss a certain young lady, it was competent, as part of the matter, to show who the young lady was and her name and age.

**2.   Bill of Exceptions to Cross-Examination of Defendant as a Witness.**

A bill of exceptions to interrogatories propounded to defendant as a witness on his cross-examination, to be sufficient, should state what the answers to the interrogatories were.

**3.   Same.**

Where the objections to questions asked the defendant as a witness were, that the matters inquired about were new, not germane nor relevant to anything brought out on the examination in chief, the bill of exceptions is insufficient if it does not show either by certificate of the judge that defendant had not in fact been examined in chief as to the matters objected to, or the bill should set forth the examination in chief of defendant, so as to enable the court to see whether the questions asked were or were not as to new matter and matter not germane to the examination in chief.

**4.   Defendant as Witness—Cross-Examination.**

When a defendant takes the stand as a witness in his own behalf, he may be cross-examined as to the entire case, although he may have testified on his examination in chief only to isolated matters connected with the transaction.

**5.   Improper Argument of Counsel—Practice.**

Where the prosecuting counsel has indulged in improper argument, for which, on objection, he has been reprimanded, and the jury also are instructed to disregard and not consider the same, this is sufficient in the absence of any requested instruction on the subject.

**6.   Murder—Defendant's Condition of Mind—Charge.**

Where the court instructed the jury, "When an unlawful killing is established, the condition of the mind of the party killing, at the time, just before, and just after the

killing, is an important consideration in determining the grade of the homicide," etc.; Held, not upon the weight of the testimony, nor an assumption that defendant was guilty of some grade of culpable homicide. It was an instruction to the jury to do just exactly what it was their duty to do.

#### 7. Same—Principals—Charge.

On a trial for murder, where it appeared that the actual killing was by one S., but that defendant was present and acting with S., the court properly, after defining who were principals, and after having charged as to the guilt of S., instructed the jury, that if defendant acted with S. in the commission of the offense in pursuance of a common intent and in pursuance of a previously formed design in which their minds united and concurred, he would be a principal. Nor was it necessary, in that connection, to instruct the jury that the common intent must be to kill the deceased, since that followed as a natural sequence from what had gone before.

#### 8. Same—Manslaughter—Charge.

On a trial for murder, where the actual killing was by one S., and the court, after instructing the jury with reference to the killing by S., and also as to the law of principals, instructed them in effect that if defendant was present and made himself a party to the difficulty, and acted together with S. in the commission of the offense, then to find defendant guilty of manslaughter; Held, the charge was not indefinite nor uncertain, nor calculated to confuse or mislead the jury.

#### 9. Same.

On a trial for murder defendant has no ground for complaint that the court gave a general charge on manslaughter.

#### 10. Same—Manslaughter—Insult to Wife.

On a trial for murder, where it appeared in evidence that on the day before the homicide defendant was informed that deceased had said, if defendant's wife had circulated a report that he had kissed Miss M., she was a bitch; and it further appeared that defendant had not met deceased after said information until the time and place of the homicide; Held, a charge on manslaughter predicated on insulting conduct to a female relative was not only proper but requisite.

#### 11. Provoking Difficulty—Charge.

See opinion for facts stated, held to raise the issue of provoking a difficulty with intent to kill, and to authorize a charge of court upon that issue. And the charge upon such issue is sufficient, though it did not submit the words used by the party provoking the difficulty.

#### 12. Circumstantial Evidence—Charge.

Where an act is proved by positive testimony, and all that remains to be found is the intent which accompanied the act, and which may be inferred from the circumstances accompanying the act, the court is not required to charge the law of circumstantial evidence as to such intent. Following Russell v. State, 38 Texas Criminal Reports, 590.

#### 13. Murder in the Second Degree—Evidence Sufficient.

See opinion for a resume of the important facts proved which are held sufficient to support a conviction for murder in the second degree, though appellant did not actually do the killing, but was a principal thereto by the fact of his abetting and encouraging the actual slayer.

ON MOTION FOR REHEARING.

#### 14. Murder by Mob Violence—Construction of Statute.

In construing the Act of the Special Session of the Twenty-fifth Legislature, page 50, making it a separate specific offense to take human life by "mob violence," the conditions existing at the time of the passage of the act are to be looked to; how the law then stood, and the evil desired to be remedied. The evil intended to be remedied was the taking from the custody of officers of the law, by bodies of armed citizens constituting a mob, persons accused of crime. The remedy provided was threefold: 1. Speedy punishment in cases of rape. 2. Giving venue in cases of mob violence to counties other than the county where committed. 3. By removal of officers who permitted prisoners to be taken from their custody by mobs.

**15. Same.**

While the Legislature, in describing "a mob," provided that it might consist of even as small a number as two persons, it was not intended, nor was there any intention, to embrace within the provisions of the act homicides committed in pursuance of a conspiracy instigated by personal malice, and there was no intention, in passing said act, to repeal our statutes with reference to murder committed in pursuance of a conspiracy or combination, unless the object of such conspiracy or combination was the taking from the custody of officers, by force, one charged with or who had committed a crime, and execute him by violence.

APPEAL from the District Court of Franklin.   Tried below before Hon. J. M. TALBOT.

Appeal from a conviction for murder in the second degree; penalty, fifteen years imprisonment in the penitentiary.

The indictment charged appellant with the murder of W. T. Willard on the 20th day of March, 1897, but cutting him with a knife.

The important facts connected with the homicide are summarized in the court's opinion below.

*Todd & Glass,* for appellant.—It is elementary law that in the examination of any witness the cross-examination must be confined to the matters about which the witness has been examined in chief.   Greenleaf says: "A party has no right to cross-examine any witness except as to facts and circumstances connected with the matter stated in his direct examination. If he wishes to examine him as to other matters he must do so by making the witness his own, and calling him as such in the subsequent progress of the cause." 1 Greenl. on Ev., Lewis' ed., 1896, sec. 445.   The above language is quoted from the opinion of the United States Supreme Court in Railway v. Stimpson, 14 Peters, 461, per Story, J.   A large number of cases from almost every State arc cited to sustain the text.

On the same subject Underhill, in his recent valuable work on Criminal Evidence, uses the following language:   "The scope and right of cross-examination are generally limited to subjects upon which the witness has been interrogated on the direct examination; that is, counsel cross-examining will not be permitted to ask leading or general questions on matters which, though involved in the general issue of the prisoner's guilt, were not touched on in the direct examination.   While counsel may cross-examine on relevant facts gone into on the direct examination, he may not open his own case and present evidence to support it by cross-examining the adverse witnesses."   Underh. Crim. Ev., sec. 220, p. 270, and many cases cited.

The only recognized exception to the above rule is that the credibility of the witness may be attacked, or predicate laid for impeachment. Underh. Crim. Ev., sec. 60.   The questions objected to in this case were not of that character, nor claimed to be such.

It is settled by this court that a defendant testifying in his own behalf may be cross-examined as any other witness.   Wills. Crim. Stats., 1897, art. 770; Bell v. State, 31 Texas Crim. App., 276; Hutchins v. State, 33 Texas Crim. Rep., 298; Holley v. State, 46 S. W. Rep., 39.

When first so held, the question was whether a defendant could be cross-examined at all or not. Concede the fullest right of cross-examination, yet when the subject matter of the examination in chief is wholly abandoned and the cross-examiner enters on an entirely new field of inquiry, this is not cross-examination, but it is making the witness a witness for the opposite party. This is often done with ordinary witnesses as a matter of convenience in our practice, without the necessity of retiring and recalling the witness, which was formerly required. But when this is attempted by the State with a defendant on trial for felony testifying in his own behalf, the State thereby makes the defendant a witness for the State against himself in direct violation of the constitutional guaranty that a person charged with crime shall not be compelled to give evidence against himself. If it be said this constitutional guarantee is waived and surrendered by the defendant availing himself of the statute permitting him to testify in his own behalf, then we say the statute is a delusion and a snare, and ought to be repealed. But such is not the case. It is not in the power of the Legislature to deprive a defendant of the constitutional protection by direct or indirect enactment; must less is it in the power of the courts to do so by construction of a statute which does not purport to do so in terms. If the statute permitting a defendant to testify in his own behalf had been coupled with a distinct proviso that if he did so he should be deemed to have waived his constitutional rights and might be compelled to give evidence against himself, such proviso would be void, and the court would be compelled to so hold. The question here presented has neither been directly discussed nor decided by this court in any of the adjudicated cases, but it has been held that a wife can not, under the guise of cross-examination, be made a witness for the State against her husband. Gaines v. State, 38 Texas Crim. Rep., 202; Welch v. State, 46 S. W. Rep., 812.

We stand upon the law as stated by Judge Cooley, the most distinguished authority on constitutional questions of this or any other country:

"A disposition has been manifested of late to allow the accused to give evidence in his own behalf; and statutes to that effect are in existence in some of the States, the operation of which is believed to have been generally satisfactory. These statutes, however, can not be so construed as to authorize compulsory process against an accused to compel him to disclose more than he chooses; they do not so far change the old system to establish an inquisitorial process for obtaining evidence; they confer a privilege which the defendant may use at his option. If he does not choose to avail himself of it, unfavorable inferences are not to be drawn to his prejudice from that circumstance; and if he does testify, he is at liberty to stop at any point he chooses, and it must be left to the jury to give a statement, if he declines to make a full one, such weight as, under the circumstances, they think it entitled to; otherwise the statute must have set aside and overruled the constitutional maxim which protects an accused party against being compelled to testify against himself, and the

statutory privilege becomes a snare and a delusion." Cool. Const. Lim., 5 ed., 883, pp. 385-388.

This court, in the opinion, cites the Quintana, Hutchins, and Morales cases. In these and other cases it is simply held that a defendant may be cross-examined as any other witness; that is, as to matters brought out in examination-in-chief, and as to matters affecting his credibility as a witness. This is not disputed; it is the common law rule as construed by the United States Supreme Court and by this court in the cases above cited. The case of People v. Tice (New York) is also cited by the court, and the notes to the report of this case in 15 Lawyers' Reports Annotated. In New York a different rule as to cross-examination prevailed, and the court in the course of the opinion says:

"In construing this recent legislation there has been much contrariety of decision in different States as to the scope of the right of cross-examination. In other States it has been held that the right of cross-examination under these statutes is confined to matters referred to in the examination-in-chief, and the witness can not be required to answer as to other facts material to the issue." The New York court adopted the other rule,—that cross-examination might extend to any matter pertinent to the issue in the case, and in conflict with the common law, as construed by the decision of the Supreme Court of the United States and of this court. In the note to People v. Tice the annotater says: "Whether the range of cross-examination will be restricted to that of the direct will depend upon the rule of cross-examination of witnesses which prevails in each jurisdiction; that is, whether the strict, so-called, American rule is followed, or the liberal English rule." We have shown that the "strict American rule" has heretofore obtained in this court, and not the "liberal English rule," where the courts are unhampered and unembarrassed by a written constitution. This court can not adopt that "liberal English rule"—the New York rule—without practically and effectually overruling the Washington, Jones, Gaines, and Welch cases, cited supra, and many previous decisions of our Supreme court. The courts of a number of States have adopted the "liberal English rule" as to cross-examinations, and these courts hold that a defendant may be cross-examined as to any matter pertinent to the issue; but other States follow the American rule as stated by Greenleaf, Underhill, Wharton, the Supreme Court of the United States, and by this court. In some States (California, Missouri, Arizona, Louisiana, Oregon, and perhaps others) the statute provides in effect that a defendant may be cross-examined as to all matters about which "he was examined in chief." This is but the statutory enactment of the common law rule as to any witness; and our statute being silent on this question, the common law prevails. In such States it is uniformly held that the cross-examination is restricted to the matters referred to in the direct examination. See People v. O'Brien, 66 Cal., 602; State v. Chamberlain, 89 Mo., 129; State v. Patterson, 88 Mo., 88; State v. McLaughlin, 76 Mo., 220; State v. Turner, 76 Mo., 350; State v. Porter, 75 Mo., 171; State v. McGraw, 74 Mo., 573;

State v. Trott, 36 Mo. App., 29; State v. Saunders, 14 Ore., 300; State v. Lurch, 12 Ore., 99; State v. Wright, 40 La. Ann., 589; State v. Baker, 43 La. Ann., 1168.

In the Lurch Case (12 Oregon, 99) the court says: "The humane principle of the law, that the party shall not be compelled to be a witness against himself, is as effectually violated when the cross-examination of the accused is extended beyond the facts to which he has testified, as it would be if he were to be called and made to testify at the instance of the State."

*Mann Trice,* Assistant Attorney-General, for the State.—The proposition submitted under the second bill is untenable, (1) because the common law rule, which confines the cross-examination of a witness to the matter inquired about on the examination in chief, does not obtain in this State. Morris v. State, 30 Texas Crim. App., 95; Brookin v. State, 26 Texas Crim. App., 121; Johnson v. State, 27 Texas Crim. App., 163; Miller v. State, 28 Texas Crim. App., 445; Wicks v. State, 28 Texas Crim. App., 448. This is true as to both civil and criminal cases. Rhine v. Blake, 59 Texas, 240. This is believed to be the universal rule, except in cases where the wife, one of the spouses, is called as a witness, then the examination is confined to the matter inquired about on the examination in chief. This exception exists by virtue of the statutory inhibition against giving evidence, one against the other.

(2) Because, by availing himself of the statutory privilege of becoming a witness in his own behalf, he waives his constitutional exemption from being a witness against himself, and places himself in the attitude of any other witness in respect to the right of cross-examination. People v. Tice, 15 Law. Rep. Ann., 669, and authorities cited in note.

Mr. Bishop on this subject says: "The tender of his testimony is deemed a waiver of every form of the exemption from criminating himself." 1 Bish. New Crim. Proc., 1183.

As said in McGary v. People, 45 New York, 153, speaking of a defendant who offered himself as witness: "He was not only a volunteer, but had taken the necessary oath to enable himself to testify,—to tell the truth, the whole truth, and nothing but the truth, upon the whole issue. He could not have been compelled to give evidence at all, but when he made himself a witness he waived the constitutional protection in his favor and subjected himself to the peril of being examined as to any and every matter pertinent to the issue."

I am aware that opinions may be found apparently contradicting this doctrine, noticeable Missouri, Michigan, Georgia, Florida, Colorado, and possibly other States. But upon examination of the cases, you will find that the opinions are based on statutes limiting and restricting the right of cross-examination to matters elicited on direct examination. No such restriction or limitation is to be found in article 770, Code of Criminal Procedure. The general rule in jurisdictions where there is no statutory limitation is that an accused person testifying in his own behalf is

to be cross-examined like any other witness, and when he elects to testify in his own behalf, waives the constitutional protection against being compelled to give evidence against himself. See Connor v. People, 50 N. Y., 240; Boyle v. State, 2 West. Rep., 788; Keys v. State, 122 Ind., 527; State v. Puferile, 36 Kan., 90; Fralich v. People, 65 Barb., 48; Marx v. People, 63 Barb., 618; State v. Huff, 11 Nev., 17; McKeone v. People, 6 Col., 346; Chambers v. People, 105 Ill., 409; Spies v. People, 122 Ill., 235; 10 West. Rep., 201; State v. Wentworth, 65 Me., 234; 20 Am. Rep., 680; State v. Ober, 52 N. H., 459; 13 Am. Rep., 88; Rains v. State, 88 Ala., 91; People v. Burg, 82 Mich., 49; People v. Howard, 73 Mich., 10.

The cases from Michigan, supra, were decided after the limitation by statute had been removed. "Since the statute of 1881, he may be cross-examined like any other witness on matters outside of his testimony in chief." Bottom note on p. 678, 15 Law. Rep. Ann. In construing a statute similar to ours in Massachusetts, Bigelow, C. J., said, "He is competent, not for a special purpose, or to give evidence only which shall operate in his favor, but competent to testify to any facts relevant and material to the issue. Like all other witnesses, he is to tell the truth and the whole truth concerning any matter to be inquired about. If he offers himself as a witness, he waives his constitutional privilege of refusing to furnish evidence against himself." Quoted with approval by Supreme Court of Missouri. See Clinton v. State, 67 Mo., 388.

Again: "When he made himself a witness under the privileges of the act, he waived the constitutional protection in his favor and subjected himself to the peril of being examined as to any and every matter pertinent to the issue. Any other construction would render the statute the most effectual shield to crime and criminals that could be devised." McGary v. People, 2 Lansing, 227; Clinton v. State, 67 Mo., 387.

From the foregoing authorities, it is obvious that the constitutional provision invoked by appellant (to be found in the Federal as well as the State Constitution) was aimed at the practice which in early times prevailed in England and on the continent of Europe of subjecting accused persons to torture in order to extort confessions of guilt, and against the practice, which prevailed in some countries, to subject the accused to an examination in the absence of counsel in order to probe his conscience and induce a statement of a criminating fact. This constitutional guaranty does not inhibit a defendant from accepting the provisions of the enabling statute, which permits him to be a witness. This is a privilege not accorded by the common law, but conferred by statute. It is manifestly unreasonable to presume that the Legislature intended to confer the privilege upon a defendant to testify to those matters thought to be beneficial to himself, and refuse to testify to others. This view would be inconsistent with the oath administered

40th Crim. Reps.—26

to the witness, and inconsistent with the very object and purpose of judicial investigation, viz., to ascertain the truth as to the issues under investigation.

Neither the court nor all the power of the State can compel the defendant to testify, for the Constitution is his shield; but when he accepts the benefits of the act and takes the witness stand, under all the authorities he waives the constitutional guaranty in so far as the case under investigation is concerned. To hold otherwise would be to presume that the Legislature intended to confer upon one party to a suit a right not accorded the other, and thus by law give the defendant advantage of the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of fifteen years; hence this appeal.

The first bill of exceptions is as follows: "The State proposed to prove the name and age of the young lady (Miss Mitchell) about whom the evidence showed the wife of the defendant and Will Swanner had made statements to the effect that they had seen her kissing deceased, Will Willard. To the proving of her name and age, the defendant, by counsel, objected, because such evidence was immaterial and irrelevant, and was calculated to prejudice defendant in the minds of the jury. But the court overruled the defendant's objection, and admitted the testimony, to which ruling and action of the court defendant at the time excepted," etc. This bill leaves us utterly in the dark as to what proof the State in fact made as to the age of Miss Mitchell. For aught that we know, she may have been quite a young lady, or an old maid. At the outset, we are informed that her name was Miss Mitchell, but the bill does not show that this proof was made by the State. But, more than this, we are utterly at a loss to understand how proof of the name and age of a party about whom the charge of kissing is said to have been made could have prejudiced appellant. There was no objection urged as to the testimony in regard to the wife of defendant and his codefendant, Will Swanner, having stated that they saw the deceased kissing a young lady. But the objection was merely in regard to the name and age of the young lady. This evidence does not appear to have been hearsay, irrelevant, or immaterial. On the contrary, it appears that, after the State had proved that the difficulty between defendant and Will Swanner and deceased grew out of statements made by the wives of defendant and Will Swanner, to the effect that they had seen deceased kiss a certain young lady, as a part of that matter it was competent to show who the young lady was.

The second bill of exceptions is as follows: "When Bill Alexander was on the stand as a witness in his own behalf on the trial of this case, the State's counsel, while cross-examining the defendant, asked and examined relative to the following matters: (1) Whether he did not tell Leander Crow, about half an hour after the difficulty, and at

the place where it occurred, in reply to a statement there made by the said Crow to the effect that it was a cowardly affair, and Swanner would never have cut him (Crow), as follows: 'Yes, he would.' (2) Whether Swanner did not tell him deceased had stopped him at his (deceased's) house, and cursed him (Swanner) and called him a liar. (3) Whether Swanner did not tell him that he (Swanner) had bought a new knife. (4) Whether he (defendant) did not tell one McGrew, the morning of the day of the difficulty, in effect, that, if Willard had said what he (defendant) had heard he said about defendant's wife, he and deceased could not live in the same country. To each and all of which questions and answers the defendant, by counsel, objected, upon the ground that these matters were new, and not germane or relevant to anything brought out in defendant's examination in chief, and were not legitimate cross-examination, but the State was making a witness of the defendant against himself, and seeking to compel him to give evidence against himself, independent of the matters about which he was examined in chief. But the court overruled the said objections, and required and compelled defendant to answer said questions, to which defendant excepted," etc. The bill shows that the State was permitted to cross-examine appellant relative to the following matters, and then follow, seriatim, from 1 to 4, inclusive, the matters about which the State was permitted to cross-examine the witness. But it is not stated what the answers of the witness were to said inquiries. To have been a good bill of exceptions, the answers of the witness to the inquiries should have been stated. We can not help out the bill by presuming what the answers were. Moreover, the bill shows that certain grounds of objection were urged to said cross-examination, to wit, that the matters inquired about were new, and not germane nor relevant to anything brought out in defendant's examination in chief. But the grounds of objection stated do not constitute a certificate on the part of the judge that said grounds were true. The bill should have informed us, by a proper certificate of the judge, that the appellant while on the stand had not been examined as to any matters contained in the cross-examination objected to; that is, either this course should have been pursued, or the examination in chief of appellant should have been stated, so that we might determine whether or not the questions asked were upon issues arising out of, and germane to, the examination in chief. Neither of these modes was followed, and we have in this bill merely the questions asked, and the grounds of objection urged. This, as we understand it, does not raise the issue presented by appellant in his assignment of errors, and in his brief on this question; that is, that, over his objection, the court permitted appellant to be made a witness against himself, which he insists is violative of section 10 of article 1 of our Constitution. If this question, however, had been properly raised, we are inclined to the view that it would not have availed appellant. See Quintana v. State, 29 Texas Crim. App., 401; Hutchins v. State, 33 Texas Crim. Rep., 298. The doctrine contained in the Quin-

tana Case was modified in Morales v. State, 36 Texas Crim. Rep., 234; but not in respect to the constitutional question involved. . For other authorities, see People v. Tice (N. Y. App.), reported in 15 Law. Rep. Ann., 699, and note thereto on page 673 (same case, 30 N. E. Rep., 494). There are some authorities holding that, where a defendant takes the stand in his own behalf, his cross-examination will be strictly confined to matters about which he has been examined in chief. Appellant cites us to the following: 1 Greenl. Ev., sec. 445; Underh. Crim. Ev., secs. 60, 220, 270; Railway v. Stimpson, 14 Pet., 461. But we believe that, under a Constitution similar to ours on this subject, the weight of authority is in favor of the proposition that, where a defendant takes the stand on his own behalf, the State will not be restricted, by a rigid rule, on his cross-examination, to the mere examination of the witness as to matters inquired about in the examination in chief. Having become a witness on his own behalf, he may be cross-examined as to the entire case, although he may have testified on his examination in chief only to isolated matters connected with the offense charged against him.

Appellant, by bill of exceptions, also objected to remarks made by the prosecuting counsel in the closing argument, to the effect that he knew two of the State's witnesses, and that they were worthy and truthful boys. It appears from the bill that, on objection urged to these remarks, the court reprimanded counsel, and instructed the jury verbally to disregard said remarks and not consider the same. In the absence of any requested instruction on the subject, this action of the court was sufficient. In addition to this, however, the bill does not inform us that the two witnesses had testified to any facts that were material to the State.

In his motion for new trial, appellant raises a number of objections to the charge of the court. We have examined said charge carefully, and it occurs to us that the same is an admirable exposition of the law of the case, as applied to the facts proved. However, we will discuss such of the objections urged as we think call for discussion.

Appellant objected to the seventh paragraph of the court's charge on the ground that the court instructed the jury, "When an unlawful killing is established, the condition of the mind of the party killing, at the time, just before, and just after the killing, is an important consideration in determining the grade of the homicide," etc. Appellant complains that this charge is on the weight of the testimony. We can not so regard it. It is merely an instruction to the the jury to do exactly what it was their duty to do; that is, to consider all the testimony in the case,—before, at the time of, and subsequent to the killing,—in order to determine the state of mind of appellant at the time the killing occurred. It was neither a charge on the weight of the testimony, nor is the charge complained of, when considered in connection with that portion of the court's charge, any assumption on the part of the court that appellant was guilty of some grade of culpable homicide.

Appellant also complains of the twelfth, seventeenth, twenty-first, and twenty-second paragraphs of the court's charge, on the ground, as he urges, that by said charges the court authorized the jury to convict defendant, "if the offense was committed in pursuance of a common intent on the part of Will Swanner and the defendant, and in pursuance of a previously formed design, etc., but the court nowhere tells the jury what the character of such common intent and previously formed design must be; that is, that it must have been to take the life of Willard, or do him serious bodily harm." And, as contended by appellant, it was error to so define the common intent and design. By reference to paragraph 12 of the court's charge, it will be seen that same is a part of the court's charge on the law of principals. Paragraphs 11 and 12 embody the law on this subject, and it is in accordance with our statute defining principals. Following this, the court, in paragraph 13, instructs the jury, in a proper manner, that if they believed from the evidence beyond a reasonable doubt, etc., that Swanner, of his express malice aforethought, killed W. T. Willard, and that defendant was present and acted together with the said Swanner in the commission of said offense, if committed by him; and if they further believed from the evidence that said offense was committed in pursuance of a common intent on the part of the said Swanner and the defendant Alexander, and in pursuance of a previously formed design, in which their minds united and concurred, and was actually committed during the existence and in the execution of such common design and intent; etc.; or if the jury believed that the defendant Alexander was present when and where said offense was committed by the said Swanner, if committed by him, and then and there knew the unlawful intent of said Swanner, if his intent was unlawful, and did aid him by acts, or encourage him by words or gestures, in the commission of said offense,—then to find the defendant Alexander guilty of murder in the first degree, etc. Now, having defined who were principals, and having charged as to Swanner's g.uilt, by whom the actual killing was done, then it was entirely proper for the court to instruct the jury, if they believed that Alexander acted with Swanner in the commission of said offense in pursuance of a common intent on the part of the said Swanner and Alexander, and in pursuance of a previously formed design, in which their minds united and concurred, etc., without telling the jury in that connection that the common intent must be to kill the deceased. This followed as a natural sequence from what had gone before, and it occurs to us that the insistence of appellant in this connection is hypercritical. It is not necessary to discuss the other paragraphs above cited, as what we have said equally applies to them.

With reference to paragraph number 21, appellant particularly complains that the court instructed the jury to convict defendant, if he was present and made himself a party to the difficulty between deceased and Swanner. If this were all the charge in that connection, there might be something in this objection; but the language of the charge

does not bear out the suggestion contained in appellant's brief, that said charge was indefinite and uncertain, and calculated to mislead and confuse the jury. This is a charge on manslaughter. The court, after instructing the jury with reference to the killing by Swanner, then proceeds as follows: "If you further believe from the evidence beyond a reasonable doubt that the defendant Bill Alexander was present and made himself a party to the difficulty, if any, between the said Will Swanner and said W. T. Willard, and acted together with said Swanner in the commission of said offense, if any, then you will find the defendant Bill Alexander guilty of manslaughter, and assess his punishment," etc. The court had already told the jury what it took to constitute a principal, and the charge here, of course, was understood by the jury in the light of the preceding charge, defining who were principals; and they were properly told, if appellant was present and made himself a party to the difficulty, and acted with the said Swanner in the commission of said offense, then he would be guilty of manslaughter. But the jury evidently was not controlled in anywise by this charge, for they found the appellant guilty of murder in the second degree.

The court gave a general charge on manslaughter, and then gave a special charge predicated on insults to a female relative. While there was nothing really in the case calling for a general charge on manslaughter, and the special charge would alone have been sufficient, yet certainly appellant can not complain. He says, however, there was nothing in the evidence calling for a charge on manslaughter predicated on an insult to a female relative. We can not agree to this contention. There was testimony that appellant had been informed on the day before that deceased had said of his wife that, if she circulated the report that he had kissed Miss Mitchell, she was a bitch. It is not made clear that appellant had met deceased, since he had heard of said matter, until at the time and place of the homicide. While it may be that other matters actuated him in the difficulty, still the court was not authorized to deprive him of his defense of manslaughter, under the facts of this case; and the court would not have been justified in withholding the charge on this subject because, in his opinion, the difficulty did not occur about this, or he believed that appellant's mind was not excited on said account. The matter was introduced in evidence, and it was not only proper, but requisite, that the court should have charged upon it.

We have examined the court's charge on provoking the difficulty by Swanner, and, in our opinion, the facts proven authorized a charge on this subject. The State's witnesses unequivocally testify that Will Swanner was the aggressor, and brought on the difficulty by the use of language which could bear no other construction than a purpose to bring on a difficulty; and we do not understand that the defendant's witnesses, or even the defendant himself, differ with the State's witnesses as to this matter. The State's witnesses show: That deceased was in a certain storeroom and postoffice, in the village of Musgrove. He was standing near the door. Will Swanner, defendant Bill Alexan-

der, and his brother John approached said store, stepped up on the gallery; and, in a short time, Will Swanner stepped in the door and accosted Willard, the deceased. He said, "You took advantage of me yesterday at your house, and cursed me and called me a son of a bitch." Deceased replied, "I didn't do it;" and Swanner said, "Well, you called me a liar then, which is just as bad," and said to deceased, "Now, do you repeat it, you cowardly puppy?" Deceased replied that he did, and Swanner immediately advanced on deceased, and began cutting him with a large, new knife which he had in his hand when he came on the gallery. Defendant, in his own behalf, says: That Will Swanner said to deceased, "You took advantage of me yesterday at your own house, and cursed me and called me a liar." Swanner said something about Willard repeating it, and Willard said he did repeat it, and then struck Swanner with a stick, and then the fight began. He says, however, "I did not know that Swanner had a knife at the time." We think that this testimony, under the circumstances of this case, sufficiently raised the issue of provoking a difficulty on the part of Swanner, and that appellant himself was apprised of the fact that Swanner was the aggressor in provoking the difficulty. So the charge was not an abstract proposition, as claimed by appellant, but the court applied the law to the facts in that connection. Nor should the court have submitted the words used in connection with the charge.

Appellant also urges that the court erred in failing to charge on the law of circumstantial evidence, claiming that this is a case depending on circumstantial evidence for the conviction of appellant. The fact of appellant's going to the scene of the homicide in company with Will Swanner, and his being present at the time, and what he did there, is proved by positive evidence. Of course, a number of circumstances are detailed, both before and after the time, tending to show his malicious intent in being present, but this does not make the case one of circumstantial evidence. The rule is well expressed by Mr. Thompson on this subject, to wit: "Where a criminal intent is to be established by circumstantial evidence, the proof ought to be not only consistent with the defendant's guilt, but must be wholly inconsistent with any other rational conclusion than that of the defendant's guilt. This rule is proper when the act which is claimed to be criminal is sought to be established by circumstantial evidence; but when the act is proved by direct testimony, and all that remains to be found is the intent which accompanied the act, and which may be inferred from the circumstances accompanying the act, then this rule does not apply." See 2 Thomp. Trials, sec. 2505; Russell v. State, 38 Texas Crim. Rep., 590.

Appellant further insists that the evidence is not sufficient to support the verdict of the jury, the grounds alleged being (1) that there was no evidence of any agreement or conspiracy between defendant and Swanner to kill Willard; (2) there is no evidence that defendant ever knew Swanner intended to kill Willard, if he did so intend; (3) there was no evidence that defendant either aided Swanner by acts, or encour-

aged him by words or gestures, in the commission of the offense. We can not agree to these contentions. The evidence, we think, makes it quite clear that Swanner provoked the difficulty, and of his malice slew deceased; and we take it, if the jury encountered any difficulty at all, it was with reference to the participation of defendant in the murder. But in this regard the State introduced evidence strongly tending to show that he had malice against deceased. In fact, the cause of the difficulty appears to have been more his than Swanner's. These parties (Swanner and the defendant) were both married men, brothers-in-law, and lived together. The wife of defendant reported that she had seen deceased kiss a certain young lady on one occasion. This came to the ears of the deceased, and he denounced it as a lie; and the author, if a man, he stigmatized as a son of a bitch, and, if a woman, as a bitch. This was communicated to appellant. At least he appears to have known it the day before, and to have threatened deceased on account of it. Deceased's father on the night before undertook to reconcile the parties, and told defendant, if his boy was wrong, he would make him apologize, or whip him. He asked defendant to meet him the next day at Winsboro, some six miles distant, which defendant promised to do. The father of the deceased went to Winsboro the next day, and was there to meet defendant when his son was killed at Musgrove. Appellant did not go to Winsboro, and the State's testimony tends to show that he declared he did not intend to go there to fix it up; that he would fix it himself. Appellant, however, explains his reason for not going on other grounds. It is further shown that appellant knew that deceased and Will Swanner had had an altercation on the evening before, and that deceased on that occasion had called Swanner a liar in regard to the matter of kissing the young lady; also, that Swanner, as he says, told him that he had bought a new knife. Appellant says he had not seen the knife, nor is it stated that Swanner told him any reason for his purchase. The State showed that the difficulty occurred at Musgrove on Saturday afternoon, about 2 or 3 o'clock, and, in that connection that it was the habit of deceased to go to Musgrove for the mail on Saturday afternoon. Deceased was a boy about 17 years of age, and lived with his father, two miles west of the village of Musgrove, while defendant and Swanner lived a mile east of that place. On the evening in question, deceased had gone for the mail, and was standing inside of the postoffice. Will Swanner, the defendant, and his brother John Alexander came down the railroad from the direction of their home; and when they got opposite the store, about fifty feet from where the deceased was standing, and in view of him, they turned off the railroad, and came directly to the postoffice. Swanner, at the time he stepped on the gallery, had his knife open in his hand; it having a blade three or four inches long. In a very short time Swanner accosted the deceased, and according to the State's testimony, denounced him as a cowardly puppy, and immediately the fight began; he using a knife, and the deceased, according to some of the witnesses, using a stick. The wit-

nesses say that, as Swanner advanced on the deceased, defendant appeared to grab at Swanner as if to catch him. They say, however, that he made no other effort to interfere during the progress of the fight. The State's testimony shows that he followed Swanner into the store, and kept close to him during the fight; that after Swanner cut deceased down, and the fight had ceased, deceased rose up and said, "Swanner, you damn son of a bitch, you have killed me," and that Swanner then started after him again; that Andrews, who had a barber shop in the building, started to interfere, and defendant told him to let him alone, —that he would attend to him. It is further shown that after the difficulty these parties all retired together and held a consultation down on the railroad. The foregoing is a resume of the substantial features of the testimony. It is urged from this that there is nothing to connect appellant with a participation in the difficulty; and the fact that he grabbed at Will Swanner as he advanced on deceased, it is insisted, indicates, not only that he did not engage in the difficulty, but that he attempted to prevent it. We do not think, however, that this bit of evidence, if it be considered as an attempt to prevent the difficulty, countervails or overcomes the State's case, which not only tends to show malice on the part of defendant towards deceased, but also tends strongly to show that he conspired with Will Swanner to bring on a difficulty with deceased; that they prepared themselves for the occasion, and went together to the scene of the homicide; and that the defendant by his acts and conduct encouraged and abetted Swanner in the attack and slaying of the deceased, Willard. In our opinion, the jury were amply justified in taking this view of the case, and the charge of the court fully covered every phase of the case, both for the State and the defendant. There being no error in the record, the judgment is affirmed.

*Affirmed.*

[After the above opinion was handed down appellant filed a motion for rehearing, the fourth ground of which is as follows, viz.: "Because this prosecution is for murder by conspiracy 'of two persons,' and the offense was committed in Franklin County, hence under the Act of 1897, the District Court of Franklin County was without jurisdiction of this case."]

### ON MOTION FOR REHEARING.

HENDERSON, JUDGE.—This case was affirmed at the last Tyler term, 1898, and now comes before us on motion for rehearing. Appellant raises a number of questions, in which he contends that the court erred in affirming this case, but each of the questions so raised by him, except one, were so thoroughly discussed by the court in the opinion rendered that we do not deem it necessary to further review said assignments. Appellant, in his motion, raises a new question, not raised in the

court below, nor urged in the former disposition of this case; but he insists that the same is fundamental, and that we should now take cognizance of it, and reverse and dismiss this case. He urges that the homicide, as proved against appellant, showed that the killing was committed by appellant and another person, to wit, Will Swanner, and that they combined together for the purpose of mob violence, and in pursuance of said combination took the life of deceased, and that such killing comes under the Act of the Twenty-fifth Legislature (see General Laws Special Session Twenty-fifth Legislature, page 40) entitled "An act to fix the venue and regulate proceedings in prosecutions for murder by mob violence; define and punish murder by mob violence," etc.; and that, consequently, the prosecution can not be commenced and carried on in Franklin County, the county where the offense was committed, but must be carried on in some other county, as provided in said act. We understand it to be further conceded by appellant that the offense here for which he was convicted occurred before said act went into effect, but he claims that the act in question carved out from our offense of murder a distinct offense of murder by mob violence, and repealed all other laws in conflict therewith, and that no law now exists for the punishment of said offense; or if appellant is amenable to any law, it is the new law on the subject. This contention of appellant brings in review said act of the Legislature on mob violence. We make this proposition: if the case as presented is not one of mob violence under said act, then the questions raised with reference to venue and jurisdiction need not be considered. We quote the first and second sections of said act, as follows:

"Section 1. Be it enacted by the Legislature of the State of Texas: That whenever two or more persons shall combine together for the purpose of mob violence, and in pursuance of said combination shall unlawfully and willfully take the life of any reasonable creature in being by such violence, such person shall be deemed guilty of murder by mob violence, and upon conviction thereof shall be punished by death or confinement in the penitentiary for life, or according to the degree of murder, to be found by the jury: provided, nothing in this section shall be so construed as to in any way affect the law in regard to manslaughter, as defined in chapter 14, title 15, of the Penal Code of the State of Texas.

"Sec. 2. It shall be the duty of the district judges of the State to give this law specially in charge to the grand jury at the beginning of each term of court. Prosecutions for murder under this act may be commenced and carried on in any county of the judicial district in which the offense is committed, except the county of the offense, or in any county of the judicial district the judge of which resides nearest the county seat of the county in which the offense is committed. When the judicial district comprises only one county, prosecutions may be commenced and carried on in any adjoining county."

Now, the question arises, what did the Legislature mean by "mob violence"? Rapalje, in his dictionary, defines a mob "as an assemblage of many people acting in a tumultuous and riotous manner, calculated to put good citizens in fear, and endanger their persons and property." In 15 American and English Encyclopedia of Law, page 698, we find the term "mob" has been defined as "an unorganized assemblage of many persons intent on unlawful violence; a riot involving a multitude." In the common dictionaries we find the word "mob" defined as "a disorderly crowd; a promiscuous assemblage of rough, riotous persons; a rabble;" and they show that it is a French term, imported into our language during the reign of Charles II. "Violence," according to the law dictionaries, is synonymous with "physical force." According to the American and English Encyclopedia of Law, it is a general term, and includes all sorts of force. We find our court has in one case treated the term "violence." See High v. State, 26 Texas Crim. App., 573. In that case it was held that a mere assault was not violence. So that, if we take the two terms together, as defined in the dictionaries, mob violence would mean the infliction of some physical injury on a person by a multitude of people acting in a riotous and unlawful manner; so that if, under the act in question, two or more persons combine for the purpose of inflicting by force some injury upon another, and then, in pursuance of such combination, they unlawfully and willfully kill any person by such violence, such persons are deemed guilty of murder by mob violence. If the act is construed after this manner, then it would probably include any homicide where the deceased was shown to have been killed in pursuance of a conspiracy to injure another by force, or to take the life of another by force. But we do not believe the Legislature intended any such construction. In our opinion, they had a distinct object in view in passing the act in question. To determine this object, we are authorized to look to the conditions then existing,—how the law then stood, and the evil desired to be remedied. We know, as a matter of history, that at the time a certain character of mobs were prevalent in the State, and that for a number of years preceding the passage of the act it was a frequent occurrence in many communities of the State that armed bodies of citizens would combine together, and take from the custody of the officers of the law persons accused of crime and would execute them. Mobs of this character were especially organized in cases where persons were accused of rape, and a number of such parties were taken from the custody of officers. Some were shot, others were hanged, while a few were burned. To such an extent had this evil grown that the Governor of the State, when he convened the special session of the Legislature in 1897, submitted to that body as a special subject of legislation some mode of putting an end to this alarming state of affairs, which assumed such proportions in some parts as to bid defiance to all law. When the Legislature convened, the governor sent his special message before that body. Among other things, he suggested a speedy punishment for rape, legal denunciation of participants in mobs

as murderers, and to be punished accordingly, and removal from office of any officer who permitted a prisoner to be executed by a mob. In connection with his message, he sent a bill drafted for the purpose of suppressing mob violence. We quote the second section thereof, as follows: "Every person of a sound memory and discretion who shall kill any reasonable creature in being in this State, or participate in such killing, or aid in any manner therein, when the person so killed is accused of crime, or is in the custody of officers of the law, or is taken therefrom by violence, shall be deemed guilty of murder by mob violence and upon conviction thereof, shall be punished," etc. This bill was introduced, went through various amendments in the house and senate, and finally emerged from the Legislature in the form that we now have it. It will be seen from the history of legislation in regard to the bill that the evil intended to be remedied against as stated above was the taking from custody of officers of the law, by armed bodies of citizens, constituting a mob, persons accused of crime; and the remedies afforded were threefold, to wit: First, a speedy punishment in cases of rape, which passed the Legislature in a separate bill; second, the certain indictment of persons charged with mob violence, by providing for their indictment and trial in counties other than the county of the commission of the offense; and, third, by the removal of officers who permitted prisoners to be taken from their custody. While the Legislature, in describing the mob, so far as they did describe it, made it consist of as small a number as two persons, and so created a limitation on the hitherto definition of said term as to numbers, yet we can not find that they intended to give the term "mob violence" that latitudinous construction claimed for it by appellant. No doubt the Legislature had in mind the prevailing evil, and their purpose was to legislate against it. There was no necessity to legislate in regard to homicides committed in pursuance of a conspiracy instigated by personal malice, for the law then existing was ample in that regard. The purpose to legislate against mob violence as then prevailing and as then understood is further manifested by a reference to other sections of the same bill. The remaining sections from 3 to 6, inclusive, all relate to the removal and punishment of sheriffs and other officers who should permit or suffer prisoners in their custody, charged with crime, to be killed by one or more persons, or to be taken from their custody. This would indicate the character of mob against which the legislation in question was leveled; and there was no intention to repeal our statutes with reference to murder when committed in pursuance of a conspiracy or combination, unless such combination was with the object of taking from the custody of the officers by force one accused of crime, or possibly of taking by force one charged with crime, or who had committed a crime, though not under arrest, and execute him by violence. Under the proof in this case, there is no pretense that the deceased had committed or was charged with crime, or was in the custody of an officer. Nor can it be said that under the spirit and intent of the law, though Will Swanner

and Bill Alexander may have conspired together to kill deceased, on that account they constituted a mob. They were two persons, it is true, and under the theory of the State combined together for the purpose of doing personal injury by violence to the deceased, and so, literally speaking, they might come under the terms of the statute on mob violence; yet these facts do not bring them within its spirit and purpose. And so we hold that it was competent for the State to begin the prosecution in Franklin County, the locus of the homicide, and that, notwithstanding the passage of the law on mob violence, and its going into effect before the trial of this case, the prosecution could be maintained in Franklin County.

We do not deem it necessary to discuss the question as to whether the Legislature, by this act, has carved out from the domain of murder, murder by mob violence, and made it a distinct offense; or whether the act in question was merely to regulate the venue in cases of murder by mobs, leaving murder by mob violence equally murder under the statute as it aforetime existed. Nor do we deem it necessary now to discuss the question whether or not murder, where it is done by a mob, can only be prosecuted in some other county than the county where the offense was committed. We merely hold in this case that the homicide was not committed by two or more persons, who combined together for the purpose of mob violence, and in pursuance of such combination unlawfully and willfully took the life of the deceased. The motion for rehearing is overruled.

*Motion overruled.*