BERT CAMERON V. STATE.

No. 2008. Decided January 29, 1913.

Rehearing denied February 26, 1913.

**1.—Murder—Jury and Jury Law—Juror's Absence.**

Where, upon trial of murder, it was shown by the record on appeal that the juror for whom defendant moved to quash the venire was absent from the county and it was impossible to have him brought into court, there was no error in overruling the motion to quash and proceeding with the trial. Following Thuston v. State, 18 Texas Crim. App., 26, and other cases.

**2.—Same—Evidence—Conspiracy—Declarations of Co-Conspirator.**

Where, upon trial of murder, the evidence showed that the brother of defendant and the latter were acting together at the time of the commission of the homicide, there was no error in admitting the declarations of said brother when asked about the trouble between defendant and deceased that it was not going to leak out from them, but that it might leak out after a while, and which was made a few days before the killing in the absence of defendant; the court properly limiting this testimony to a conspiracy; besides, the ill-will of defendant towards the deceased was amply shown by other testimony.

**3.—Same—Evidence—Insulting Conduct to Female Relative—Manslaughter.**

Where, upon trial for murder, defendant's contention. was that he had been informed by his wife that the deceased raped her and that he killed him on first meeting, there was no error in permitting the State to introduce testimony which rendered it impossible for deceased to have committed such rape at any time claimed by defendant, and that it was unlikely that she had communicated such fact to the defendant and that this contention of the defendant was probably not true; the court properly submitting the issue to the jury and limiting the testimony to the credibility of the witness.

**4.—Same—Evidence—Cross-Examination.**

In the absence of a bill of exceptions, the court's action in permitting certain questions to be asked the wife of the deceased on cross-examination cannot be reviewed.

**5.—Same—Murder in the First Degree—Charge of Court.**

Where, upon trial of murder, the court's charge on murder in the first degree was in accordance with approved precedent and not on the weight of the evidence, there was no error. Following Alexander v. State, 40 Texas Crim. Rep., 395.

**6.—Same—Manslaughter—Charge of Court—Reasonable Doubt.**

Where, upon trial of murder, the court's charge on manslaughter, when taken as a whole, was correct and applicable to the facts, there was no error, the court also applying the reasonable doubt between murder and manslaughter.

Appeal from the District Court of Eastland. Tried below before the Hon. Thomas L. Blanton.

Appeal from a conviction of murder in the first degree; penalty, life imprisonment in the penitentiary.

The opinion states the case.

*Scott & Brelsford*, for appellant.—On question of overruling motion to quash venire: Ripley v. State, 51 Tex. Crim. Rep., 126, 100 S. W. Rep. 943; Lyon v. State, 89 S. W. Rep., 849; Webb v. State, 83 S. W. Rep., 394; Cortez v. State, 6 S. W. Rep., 546.

On question as to admitting evidence as to whereabouts of deceased: Morrison v. State, 61 Texas Crim. Rep., 223; Fassett v. State, 41 Texas Crim. Rep., 400; Roquemore v. State, 59 id, 568.

On question of the court's charge on manslaughter: Orman v. State, 22 v. Texas Crim. App., 604; Stewart v. State, 52 id, 273; Gillespie v. State, 53 Texas Crim. Rep., 167; Akin v. State, 56 id, 324.

On question of court's charge on murder in the first degree: Jones v. State, 29 Texas Crim. App., 338; Cordono v. State, 56 Texas Crim. Rep., 447.

*C. E. Lane*, Assistant Attorney-General, for the State.

HARPER, JUDGE.—Appellant was prosecuted and convicted of murder in the first degree, and his punishment assessed at imprisonment in the penitentiary for life.

In the first bill of exceptions appellant would show that one of the names of jurors on the venire list served on him was one G. T. Hammett, and the sheriff when calling the list stated that this juror had been reported served by mistake, when appellant moved the court to quash the venire, or to hold the venire until said juror could be summoned and brought into court. In approving the bill the court states that the juror Hammett was out of the county, and it was impossible to have him summoned. The qualification further shows that the appellant secured a jury without exhausting but eleven of

his challenges. Appellant cites us to the case of Osborne v. State, 23 Texas Crim. App., 431, as sustaining his contention. From a careful reading of it, we do not think it does do so, but on the contrary sustain the action of the court in proceeding with the trial. In that case it was held that "it will be readily admitted that the cause which will excuse ought not to be occasioned by the action of the court in derogation of the prisoner's right, but something over which the court has no control." In this case it is shown that the juror was absent from the county, and it was an impossibility for the court to have had him brought into court, and the law requires the impossible of no man or court. In the Thuston case, 18 Texas Crim. App., 26, the same learned judge who wrote the opinion in the case cited by appellant, says: "If upon the call of the list a juror is absent, and it be made to appear satisfactorily that his absence is from *sickness or other unavoidable cause,* the court may undoubtedly excuse his attendance." It was not shown that the juror was out of the county by the connivance or consent of the court, consequently when it was shown that he was out of the county, it presented one of those unavoidable causes which the law recognizes as grounds for the court to excuse the juror.

The court permitted Bob Head to testify that on Sunday before the killing he asked Beach Cameron (a brother of defendant) what the trouble was between defendant and deceased, and Beach Cameron replied: "It ain't going to leak out from us—it may leak out after awhile, but it will never come from us." The court in approving the bill objecting to this testimony qualifies it thus: "The above statement was made by Beach Cameron to Bob Head on Sunday night prior to the killing on Friday morning. On Tuesday prior to the killing, Bert Cameron borrowed a single-barrel shotgun and some cartridges from Bob Head, and returned the gun on the day after the killing. It was shown by the witness Clemmer that just a few minutes before the killing he saw the defendant turn into the lane riding a horse in a tolerably rapid lope, toward the place where the homicide occurred, and that at the same time he saw Beach Cameron running north in the same direction, and that within half hour thereafter he heard of the killing. At the very time that deceased was shot and killed, his sister, Fay Stovall, saw Beach Cameron nearly at her horse's head, running up the road with his hands in his jumper pockets, and Beach caught her horse and turned him around, and then Beach and Bert got on Bert Cameron's horse together, and Beach said, 'Go home,' and they rode off together. There were bushes and trees on the side of the road where Beach appeared, and the evidence of the deceased's sisters showed that Beach must have been in this wood at the time the fatal shot was fired, else they could have seen him in the road, as the vision in same was clear for half a mile. It was the opinion of the court that the above made the statement admissible, but the court properly limited it to whether or not

there was a conspiracy. But the defendant proved by his own witness, Mary Delaney, all about the fight between Bert Cameron and the deceased, occurring in the spring before the homicide, hence if proof of the conspiracy was not complete the statement of Beach Cameron to Head could not have been hurtful or prejudicial to defendant."

In his charge, the court instructed the jury: "The State had been permitted to introduce in evidence certain alleged acts, conduct and statements of one Beach Cameron, and I charge you that you cannot consider any of such evidence in this case for any purpose whatever, unless you should first believe and find from the evidence beyond a reasonable doubt that prior to the homicide, a conspiracy had been entered into, by and between the said Beach Cameron and the defendant, to kill the deceased, and that in pursuance of an agreement, the said Beach Cameron and the defendant acted together in causing the death of said Sutton Stovall, if in fact they did do so, or if, in fact, there was any such agreement." An acting together by two or more persons may be proven by circumstantial evidence; in fact, often cannot be proven in any other way, and when that is the contention of the State, it is proper to admit the circumstances going to show that state of facts. All the evidence cannot be obtained at any one time, and if the evidence proved the facts as stated by the court in his qualification, it was of sufficient cogency that the two brothers were acting together at the time of the commission of the homicide to admit the testimony. It may be said in addition to this that there was ample evidence in the record showing the ill-will existing between defendant and deceased, in fact towards the whole of the Stovall family, and this remark of Beach Cameron, that the cause of it would not leak out from them, would add no additional strength to the State's case, and even if it should be held that the evidence was insufficient to show that Beach Cameron and appellant were acting together, it would not present reversible error. Tinsley v. State, 52 Texas Crim. Rep., 91.

Appellant did not testify in the case, but relied on the testimony of his wife to reduce the offense to manslaughter. His wife, who was a sister of deceased, testified that on the morning of the killing deceased had come to defendant's home and raped her, and that a short time prior thereto, on July 13th, deceased had also come to their home and raped her; that she had informed defendant of these facts on the morning of the homicide and just a short time before the killing.

The State's contention in this case was that this was a manufactured defense, and defendant's wife had not been raped by her brother and had not, in fact, told him any such prior to the killing, and on this theory the State was permitted to show the whereabouts of Sutton Stovall on July 13th, and if the State's testimony was believed, it rendered it impossible for him to have been at the home

of appellant and raped his wife on that day. The State was also permitted to introduce witnesses to show the whereabouts of deceased on the morning of the homicide, and if the jury believed their testimony it rendered it impossible for Sutton Stovall, deceased, to have raped her on that morning. The State was also permitted to introduce testimony that although the wife of appellant was the sister of deceased, and the daughter of Mr. and Mrs. Walter Stovall, none of the family had been permitted to see her since the date of the homicide until the time of the trial, and at the time of the trial defendant and his family kept defendant's wife in close custody, and deceased's family was not permitted to see and talk with her, until under the direction of the court it was permitted. After admitting all this testimony, the court instructed the jury:

"I further charge you that you cannot consider the evidence of the witnesses Walter Stovall, Mrs. Walter Stovall, Will Slatton, Mrs. Will Slatton, George Stovall, Fae Stovall and others, concerning the whereabouts of Sutton Stovall on the 13th and 28th days of July, 1911, for any purpose whatever against the defendant, but only in passing upon the credibility of the witness Mrs. Bert Cameron, and for no other purpose.

"I further charge you that you cannot consider the evidence of Mrs. Walter Stovall or any other witness concerning any alleged undue influence over the said Mrs. Bert Cameron, if there was any, for any purpose whatever against the defendant, but only in passing upon the credibility of the witness, Mrs. Bert Cameron, and for no other purpose."

The contention of appellant is that as his wife had testified that her brother, deceased, had raped her and she had so informed appellant, that the hands of the State were tied, and they could not in any manner attack this testimony. To state this proposition demonstrates its unsoundness. Of course it would be immaterial whether or not deceased had in fact raped his sister, if she had in fact told her husband that he had done so, for he would have the right to act in the one instance as well as in the other. But it was permissible for the State to introduce evidence tending to show that this testimony was not probably true, that in fact deceased had not raped the witness, and the witness had not so told defendant prior to the homicide. The court further instructed the jury: "In connection with the above, I charge you, that if you believe from the evidence that on the morning preceding the homicide the defendant's wife told him that the deceased had assaulted her, and the defendant believed and acted upon such information by killing the deceased upon the first meeting, then such information whether true or false, would constitute adequate cause, and it would be immaterial whether the said deceased had in fact assaulted her or not, and if defendant was so informed by his wife, then he could not be convicted of any higher grade of offense than manslaughter."

The testimony above recited is reserved in a number of bills, but we have grouped them as there was but one question involved, and that was, could the State attack the credit of the witness who had testified to the rape, and that she had so told defendant. If the State could do so, then the testimony was legitimate and properly admitted in evidence, and if not, then it all should have been excluded. Appellant cites us to a number of authorities to show that a witness cannot be impeached upon an immaterial matter. This is the law, but the testimony of Mrs. Cameron was not about an immaterial matter—it was upon her testimony, that deceased had raped her and she had so informed defendant, defendant relied on it to reduce the offense to manslaughter, consequently her testimony was as to a material issue in the case, and the State was authorized to introduce any legitimate fact or circumstance tending to show that deceased had not raped her, and she had not so told her husband prior to the homicide.

The matter complained of in ground No. 6, that the court erred in permitting certain questions to be asked the wife. of deceased on cross-examination, cannot be reviewed as there was no bill of exceptions reserved thereto, and it is not verified in any way.

The court's charge in defining murder in the first degree and express malice did so in language frequently approved by this court. (Branch's Crim. Law, secs. 420 and 421.) The first criticism is that "The charge was upon the weight of the evidence, because the court in effect told the jury if they found certain facts or circumstances from the evidence to exist, it would be express malice." This court expressly held contrary to this contention in Alexander v. State, 40 Texas Crim. Rep., 395. The other criticisms of the charge on murder in the first degree are equally without merit. As hereinbefore stated, the charge is drawn in language that has always received the approval of this court.

The remainder of the motion for new trial relates to the charge on manslaughter, and we here give it in full:

"Manslaughter is voluntary homicide committed under the immediate influence of sudden passion, arising from an adequate cause, but neither justified nor excused by law.

"By the expression 'Under the immediate influence of sudden passion' is meant, that the provocation must arise at the time of the commission of the offense, and that the passion is not the result of a former provocation. The act must be directly caused by the passion arising out of the provocation. It is not enough that the mind is merely agitated by passion arising from some other provocation, or by a provocation given by some person other than the party killed. The passion intended is either of the emotions of the mind, known as anger, rage, sudden resentment, or terror, rendering it incapable of cool reflection.

"By the expression 'adequate cause' is meant such as would commonly produce a degree of anger, rage, resentment or terror, in a person of ordinary temper, sufficient to render the mind incapable of cool reflection. The following are deemed adequate causes, such as will reduce an unlawful killing to the grade of manslaughter, viz.; (1) Adultery of the person killed with the wife of the person guilty of the homicide; provided, the killing occur as soon as the fact of an illicit connection is discovered. (2) Any insulting words or conduct of the person killed towards a female relation of the party guilty of the homicide, when the killing takes place immediately upon the happening of the insulting conduct, or the uttering of the insulting words, or at the first meeting between the party killing and the party killed, after learning of or being informed of such insults. (3) Any condition or circumstance which is capable of creating and which does create passion, such as anger, rage, sudden resentment or terror, rendering the mind for the time, incapable of cool reflection, whether accompanied by bodily pain or not. The above are deemed adequate causes, and whether such adequate cause existed for such passion, if there was any, it is for you to determine and in determining this question, as well as all other matters before you, you will consider all the facts and circumstances in evidence in the case. And where there are several causes to arouse passion, although no one of them alone might constitute adequate cause, it is for you to determine from all the facts and circumstances in the case, whether or not all such circumstances combined, might be sufficient to do so.

"In order to reduce a voluntary homicide to the grade of manslaughter, it is necessary not only that adequate cause existed to produce the state of mind referred to herein, but also that such state of mind did actually exist at the time of the commission of the offense.

"In connection with the above, I charge you, that if you believe from the evidence that on the morning preceding the homicide the defendant's wife told him that the deceased had assaulted her, and the defendant believed and acted upon such information by killing the deceased upon the first meeting, then such information, whether true or false, would constitute adequate cause, and it would be immaterial whether the said deceased had in fact assaulted her or not, and if defendant was so informed by his wife, then he could not be convicted of any higher grade of offense than manslaughter.

"Now if you believe from the evidence beyond a reasonable doubt that Bert Cameron, with a shotgun, and that the same was a deadly weapon, in a sudden passion arising from an adequate cause, as the same has heretofore been explained, with intent to kill, did, in the County of Eastland and State of Texas, on or about the 28th day of July, A. D. 1911, unlawfully shoot and thereby kill the said Sutton Stovall, if in fact he did do so, then you would find the defendant guilty of manslaughter and assess his punishment at confinement in

the State penitentiary for any term of years, not less than two nor more than five, as in your discretion you may determine and so state in your verdict.''

Appellant in his motion selects various excerpts from this charge and criticises same, but it is incumbent upon us to take the charge as a whole, and if when so read it fairly presents the issue in accordance with the evidence. adduced on the trial, no error is presented. Fay Stovall testified that she and her brother (deceased) and her sister Cordie started from their father's home to Nimrod to preaching. That before they had gone but a short ways she saw defendant approaching on horseback. That when he met them he told (to use her own language), ''Sutton to 'get out of there.' He then fired the gun. He fired the gun at Sutton and missed him. Bert Cameron fired the gun. At the time he fired the gun, Sutton was sitting between me and Cordie. When Bert fired the gun, Sutton says 'Don't shoot; don't Bert.' Me and my sister screamed 'don't Bert.' Bert Cameron was nearly past the horse (to the buggy) before I noticed the gun. He was nearly past our horse before I noticed the gun. He was holding the gun up. It was a double-barrel shotgun. After Bert fired the first shot, Sutton slapped the horse with the lines and started him faster. The horse that we were driving went south. Bert then overtaken us. I don't remember whether I looked back before he overtook us and before the second shot or not. The next thing that happened, that I know of, he blowed his brains out. I was sitting on the left hand side of the buggy and Bert came up on the left hand side. My sister was sitting on the right hand side of the buggy, going south. At the second shot, Bert just rode up by the side of the buggy and pointed the gun in and shot his brains out. When he shot Sutton, Sutton fell over in Cordie's lap. He didn't say anything. He didn't speak. I reckon he just died right then. He never did speak. Bert did not say anything after he shot, nor after the second shot. I never heard him if he did. Right after the second shot was fired, I saw Beach Cameron there. He was nearly to the horse when I saw him. He came running up the road with his hands in his jumper pockets and he caught the horse and turned it around for us. After our horse was turned around, I looked back and both Beach and Bert were on the horse. I heard Beach say, 'Go home.' '' There was evidence in the record showing previous ill-will, a fight, etc. The court also instructed the jury if they had a reasonable doubt as to whether defendant was guilty of murder or of manslaughter, to give defendant the benefit of the doubt and find him guilty of no higher grade of offense than manslaughter.

There is no evidence tending to show that appellant acted in self-defense. The only defense was the attempt to reduce the homicide to manslaughter, based on the testimony of his wife hereinbefore recited, and when we read the charge on manslaughter as a whole we think it fairly and fully presents that issue to the jury for their

determination, and the criticisms of this charge present no such question as should call for a reversal of the case.

If the jury had believed the testimony of appellant's wife, under the charge they could have found him guilty of no higher grade of offense than manslaughter, but evidently they believed the State had successfully attacked this testimony, and shown it to be an after consideration.

The judgment is affirmed.                          *Affirmed.*

[Rehearing denied, February 26, 1913.—Reporter.]